UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| KARL R. GOENS, | CASE NO. 3:22-CV-02115-JRK |
| Plaintiff, | JUDGE JAMES R. KNEPP, II |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| COMMISSIONER OF SOCIAL SECURITY, | REPORT AND RECOMMENDATION |
| Defendant. | |

## INTRODUCTION

Plaintiff Karl R. Goens challenges the Commissioner of Social Security's decision denying disability insurance benefits (DIB) and supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On November 22, 2022, pursuant to Local Civil Rule 72.2, this matter was referred to me to prepare a Report and Recommendation. (Non-document entry dated Nov. 22, 2022). Following review, and for the reasons stated below, I recommend the District Court **AFFIRM** the Commissioner's decision.

## PROCEDURAL BACKGROUND

Mr. Goens filed for DIB and SSI on May 11, 2020, alleging a disability onset date of October 13, 1972. (Tr. 65-66). The claims were denied initially and on reconsideration. (Tr. 67-84, 87-102). Mr. Goens then requested a hearing before an Administrative Law Judge. (Tr. 125-26). Mr. Goens (represented by counsel) and a vocational expert (VE) testified at a hearing before the

ALJ on March 29, 2021. (Tr. 44-64). On July 8, 2021, the ALJ issued a written decision finding

Mr. Goens not disabled. (Tr. 21-41). In his decision, the ALJ noted Mr. Goens' prior applications

that were denied at the initial level on February 19, 2018, determined there was no reason to

reopen the applications, and concluded "the issue of disability under Title II will be considered

beginning February 20, 2018, and since May 11, 2020 (the filing date) under Title XVI." (Tr. 24).

The Appeals Council denied Mr. Goens' request for review, making the hearing decision the final

decision of the Commissioner. (Tr. 1-7; *see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, and

416.1481). Mr. Goens timely filed this action on November 21, 2022. (ECF #1).

Factual Background

I.   Personal and Vocational Evidence

Mr. Goens was 47 years old when he filed his applications for DIB and SSI. (Tr. 67). He

obtained his GED in 1994 and has worked as a box maker, a laborer, and a stacker. (Tr. 241).

II.   Relevant Medical Evidence

On March 8, 2019, Mr. Goens went to the emergency department complaining of left-

sided rib pain one week after having a seizure and falling. (Tr. 322-23). He reported not taking his

antiseizure medication, Lamictal, because "they don't work" and no follow up with neurology since

September 2018. (Tr. 323). He endorsed having a seizure disorder since he was a child and

reported having several seizures per week. (Tr. 326). On examination, Mr. Goens had left lateral

chest tenderness with palpation; otherwise, he had normal motor and sensory function without

focal deficits. (Tr. 325). An X-ray of his left ribs revealed no acute findings. (Tr. 326). The treating

provider recommended Mr. Goens take his prescription medication as directed and follow up with

neurology. (*Id.*).

On October 3, 2019, Mr. Goens went to the emergency department for chest pain beginning that morning and numbness in his left arm and the last three fingers of his left hand that began a few weeks prior. (Tr. 389-90). Physical examination revealed tenderness along the left cervical paraspinous muscles in the lower portion of the cervical neck and along the left medial scapula. (Tr. 392). EKG and chest X-rays were normal. (Tr. 392-93). The treating provider determined the signs and symptoms were consistent with cervical radiculopathy and prescribed Flexeril, Norco, and Motrin. (Tr. 395).

On November 11, 2019, Mr. Goens went to the emergency department for chest pain lasting four days. (Tr. 453). He admitted to drinking one beer that day and being non-compliant with his prescribed medications. (Tr. 455). Mr. Goens also reported having a "seizure disorder" and being off all medications. (Tr. 457). The treating provider noted: "Patient did proceed to have a 'seizure' here in the emergency room that did appear to be a pseudo-seizure in which the patient came out immediately." (*Id.*). The pseudo seizure was described as a "1-2-minute episode of tonic clonic movement of his neck and chest but not his extremities." (Tr. 458). After the episode, Mr. Goens immediately asked "What happened?" (*Id.*). Later, Mr. Goens had another episode of "seizure like activity" lasting about three minutes. (Tr. 464). He woke up right away, shouted an expletive, and asked where he was. (*Id.*). The nursing note indicated Mr. Goens was "completely awake and alert" after the episode. (*Id.*). Physical examination revealed no focal motor or sensory deficits, and he was described as cooperative, with appropriate mood and affect. (Tr. 458). Laboratory testing showed an ethanol level of 0.099 g/dl, above the normal range between 0.0 and 0.08 g/dl. (Tr. 461, 467). A chest X-ray showed no evidence of active pulmonary disease. (Tr. 462). Mr. Goens received normal saline for hydration and Ativan to control his pseudo-seizures. (*Id.*).

The treating provider diagnosed Mr. Goens with toxic effect of unspecified alcohol, generalized anxiety disorder, and chest pain and discharged him in stable condition after a few hours of sleep. (Tr. 463).

On December 4, 2019, Mr. Goens attended a diagnostic mental health evaluation with Kara Reilly, C.N.P. (Tr. 648). He was unwashed, disheveled, had an odor, and brought a large duffel bag to the session. (Tr. 651). He reported being kicked out of a shelter the night before because he had been drinking. (Tr. 648). Mr. Goens described a history of seizures, depression, and bipolar disorder, and endorsed hearing voices and sometimes feeling paranoid that someone is watching him. (*Id.*, Tr. 651). He also endorsed sleeping six hours a night, increased appetite and weight gain, and decreased energy. He reported substance use with no intention of stopping, claiming he goes months without drinking and has one drink when he imbibes. (Tr. 649-50). He maintained normal eye contact and motor activity, was cooperative and euthymic with a full affect, did not display any impairments in cognition, memory, or attention, and showed poor insight and judgment. (Tr. 651-52). Mr. Goens was diagnosed with major depressive disorder with psychotic features. (Tr. 653).

On February 10, 2020, Mr. Goens established care with nurse practitioner Taylor Short, C.N.P. (Tr. 503). He reported borderline schizophrenia, bipolar disorder, and depression as well as a history of seizures, the most recent occurring within the week. (*Id.*). He endorsed feeling well that day without complaint. (*Id.*). For seizures, NP Short referred Mr. Goens to a neurologist and planned to obtain Mr. Goens' prior records and restart his medication. (Tr. 504).

On February 14, 2020, Mr. Goens met with NP Short and complained of an intermittent headache. (Tr. 501). For depression and anxiety, NP Short prescribed Zoloft. (Tr. 502).

4

On February 28, 2020, Mr. Goens attended a follow up visit with NP Short feeling well, with good energy levels. (Tr. 499). He reported medication compliance but that it was ineffective and making him tired. (*Id*.). He reported that Zoloft was not working after two weeks. (Tr. 500). After NP Short explained that SSRIs such as Zoloft typically take four to six weeks to become effective, Mr. Goens wanted to stop taking them anyway. (*Id*.). Mr. Goens also stated that the neurologist had not contacted him yet about an appointment. (*Id*.).

On March 13, 2020, Mr. Goens attended a follow up visit with NP Short without complaints; he reported good energy levels, sleeping well, and staying compliant with his medications, but had not yet seen a neurologist. (Tr. 497). NP Short ordered him to schedule a neurology appointment. (Tr. 498).

On March 20, 2020, Mr. Goens met with NP Short for a tooth infection. (Tr. 495). NP Short prescribed an antibiotic for the infection and restarted his prescription for Keppra until Mr. Goens met with a neurologist. (Tr. 496).

On March 31, 2020, Mr. Goens went to the emergency department and reported having four seizures that day. (Tr. 544). Mr. Goens reported his seizures were witnessed, described as grand mal and of unknown duration. (*Id*.). He described a history of seizures and reported taking antiseizure medication but stated it does not keep him from having seizures. (Tr. 550). He denied dizziness, headache, lightheadedness, numbness, tingling, or weakness. (Tr. 544). On arrival, Mr. Goens' blood alcohol level was 175. (Tr. 550). The emergency department physician noted:

> When I was initially talking to the patient, he went essentially unresponsive but kept protecting his airway. He was mildly tachycardic, but otherwise vital signs were normal. Oxygen saturation was still about 98% on room air. I attempted sternal rub on him as well as applied painful stimuli on all extremities with no response. This ended spontaneously after about 1 to 2 minutes. Patient also had second episode per RN[.]

I am not clear if he is having seizure activity, absent seizures, possibly primarily a psychiatric presentation.

(Tr. 546) (cleaned up). Later, a nurse witnessed a "trancelike" episode that responded to intravenous Ativan and suggested he may be having pseudo-seizures or absent seizures. (Tr. 548). Mr. Goens did not describe any postictal period following his episodes. (Tr. 556).

A chest X-ray and ECG were normal, and a head CT revealed no definite acute abnormality but did show periventricular and subcortical white matter considered advanced for his age. (Tr. 538-39, 542). The treating provider's final impression was that Mr. Goens experienced seizure-like activity and had acute alcohol intoxication without complication. (Tr. 541). The doctor suspected pseudo-seizures. (Tr. 549). He was loaded with Keppra and Vimpat and received Ativan as needed for seizures. (Tr. 548, 556-57). During his admission, a brain MRI found no acute intracranial abnormality and an EEG performed during wakefulness and sleep did not show any evidence of ongoing electrographic seizure activity or epileptiform discharge. (Tr. 570). A consulting neurologist concluded Mr. Goens' recurrent spells were suggestive of nonconvulsive complex partial seizures versus nonepileptic spells and noted significant improvement in seizure frequency with continued Keppra and Vimpat. (Tr. 561, 571). Mr. Goens was discharged in fair condition on April 2, 2020, with a prescription for Vimpat. (Tr. 571).

On April 3, 2020, Mr. Goens followed up with NP Short after his hospital admission. (Tr. 493). He reported going to the emergency department after having five seizures and being released two days later. (*Id.*). He had not yet filled the Vimpat prescription he received at discharge from the hospital the day prior. (*Id.*). NP Short examined Mr. Goens and noted he was alert and oriented without recent or remote memory impairment, had a normal attention and ability to

6

concentrate, could name objects and repeat phrases, and had normal sensation, coordination, and reflexes. (Tr. 494). NP Short ordered Mr. Goens to continue taking Keppra and Vimpat. (Tr. 493-94).

On April 5, 2020, Mr. Goens was brought to the emergency department after he called the police because he felt like he could have a seizure, then had a "staring episode." (Tr. 515, 695). He was confused afterwards but denied tongue biting and incontinence. (Tr. 520). The treating provider noted Mr. Goens was discharged less than a week ago with a similar issue and was discharged on Keppra and Vimpat; Mr. Goens claimed to be compliant with his prescriptions, but it was "unclear if he [was] actually compliant." (Tr. 515, 521). He also admitted to "not stopping daily alcohol use." (Tr. 1057). Mr. Goens had a highly elevated blood alcohol level, .197. (Tr. 515, 524). A head CT scan showed no acute abnormality, but diffuse hypodensity involving the periventricular and deep subcortical white matter likely representing chronic ischemic disease. (Tr. 516). A chest X-ray was normal. (Tr. 517). Physical, neurologic, and mental status examinations were normal. (Tr. 522-23). The consulting neurologist felt Mr. Goens had a breakthrough seizure secondary to alcohol intoxication lowering the seizure threshold. (Tr. 1059). He received a load of intravenous Keppra and was discharged the following morning with instructions to continue taking Keppra and Vimpat. (Tr. 515, 528).

During a telehealth counseling session with Angela Macek, LPC, on April 6, 2020, Mr. Goens was euthymic and reported donating blood after his recent release from the hospital. (Tr. 957). Additionally, he reported sleeping better and "doing okay," but consistently having seizures. (*Id*.). On April 13, 2020, he was euthymic but reported that his new antiseizure medication,

Vimpat, was not helping much. (Tr. 960). Ms. Macek noted continued moderate depression based on self-reported feelings of hopelessness and despair. (*Id.*).

On April 17, 2020, Mr. Goens met with NP Short and indicated he had not yet followed up with neurology, but had an appointment scheduled for the 26th. (Tr. 491). He denied having any recent seizures. (*Id.*). For the seizure disorder, NP Short ordered Mr. Goens to continue taking his medication and follow up with neurology. (*Id.*). That same day, Mr. Goens attended another mental health evaluation and reported daily flashbacks, intense dreams, auditory and visual hallucinations, mood swings, and seizures once or twice a week. (Tr. 936). Mental status examination revealed intact memory, attention, and concentration. (Tr. 938). NP Reilly prescribed Abilify and Prazosin and advised Mr. Goens to participate in weekly therapy. (Tr. 939).

On April 27, 2020, Mr. Goens spoke about his seizure on April 23. (Tr. 969). When confronted on the issue, he admitted to drinking before the incident. (*Id.*). Mr. Goens said he chose to drink because he has visions, feels overwhelmed, and the medication is not helping him enough. (*Id.*).

On May 6, 2020, Mr. Goens reported his mental health medications were making him very agitated and increased his nervousness. (Tr. 929). He was directed to stop taking Abilify until his next appointment. (*Id.*).

On May 8, 2020, Mr. Goens spoke with NP Reilly about changing his medications due to side effects. (Tr. 941). NP Reilly ordered Mr. Goens to discontinue Abilify and Prazosin and prescribed Zyprexa, Prozac, and clonidine. (*Id.*).

On May 11, 2020, Mr. Goens met with neurologist Shireen Khan, M.D., for evaluation. (Tr. 691). Dr. Khan noted a past medical history significant for seizure disorder, schizophrenia,

and alcohol abuse. (*Id.*). Mr. Goens described "passing out spells," preceded by an aura of headache and lightheadedness, and "staring spells," and denied full body shaking, tongue biting, and incontinence. (*Id.*). He endorsed daily "staring spells" and monthly "passing out episodes," but occurring three to four times since his discharge in early April. (*Id.*). Mr. Goens claimed taking Keppra and Vimpat as prescribed and denied side effects but claimed they did not help with his seizures. (*Id.*). Otherwise, Mr. Goens endorsed fatigue, cough, and seizures. (Tr. 692). Physical and mental status examinations, muscle and sensory testing, reflexes, and gait testing were normal. (Tr. 693-94). Dr. Khan felt it was unclear whether Mr. Goens had epileptic seizures, non-epileptic seizures, or syncopal episodes; she continued his medications, ordered long-term video EEG monitoring of his seizures, an EKG, a 2D echocardiogram, and a tilt table test. (Tr. 694). In addition, Dr. Khan suggested Mr. Goens seek a psychiatric evaluation and mental health counseling. (*Id.*).

On May 22, 2020, Mr. Goens met with NP Short and complained of anxiety and depression, decreased energy levels, and poor sleep, but noted no recent seizures. (Tr. 489). Physical examination was normal. (Tr. 490). Among other unrelated issues, NP Short diagnosed depression with anxiety and seizure disorder and ordered Mr. Goens to continue his medications and follow up with neurology. (Tr. 490). Mr. Goens also met with NP Reilly and reported having a seizure the night before. (Tr. 946). He claimed to "not know what is real and what is not," and endorsed a low mood, inability to enjoy activities, chronic fatigue, and low motivation. (*Id.*). He felt his anxiety was well-controlled but also described paranoia and fear about his neighbor after having a premonition that the neighbor would shoot him. (*Id.*). NP Reilly ordered Mr. Goens to continue Prozac, stop Zyprexa, start Rexulti, and increase clonidine. (*Id.*). He also spoke with

9

Marina Vaught, L.P.N., of Behavioral Health Nursing Services and described continued visual and audio hallucinations, seizures, poor sleep, and "off the scale" depression and anxiety. (Tr. 933).

On May 27, 2020, Mr. Goens met with Ms. Macek and reported his seizures continued but were less severe. (Tr. 987). A June 3, 2020, tilt-table test was normal. (Tr. 670).

On June 12, 2020, Mr. Goens attended a mental health evaluation and management appointment with NP Reilly. (Tr. 628). He reported stopping all medications because he did not know what he was supposed to take. (*Id.*). He also complained that Rexulti caused increased agitation and made him feel tired. (Tr. 629). Mr. Goens endorsed having strange dreams, sleeping at least twelve of twenty-four hours intermittently ("sleeping on and off all the time through the day and night"), and having one to three seizures a day. (*Id.*). On examination, he was alert and cooperative but shaking and jittery, displayed a spontaneous thought process with normal associations, and showed fair judgment, intact memory, and normal attention and concentration. (Tr. 630-31). Mr. Goens endorsed daily visual, auditory, and tactile hallucinations and reported feeling depressed, agitated, and irritable. (Tr. 631). NP Reilly emphasized the importance of medication compliance, prescribed clonidine and Invega, and continued Mr. Goens' diagnoses of schizoaffective disorder and major depressive disorder. (Tr. 632-33). Mr. Goens also spoke with LPN Vaught about feeling overly tired and nodding off during the day because of his new medication, having weird dreams, and increased agitation. (Tr. 935).

On June 15, 2020, Mr. Goens had a telehealth session with Ms. Macek. (Tr. 635). He was in an agitated mood, reported feeling uncomfortable talking about his depressive symptoms in the home, and endorsed nightmares, flashbacks, and seizures. (Tr. 636).

On June 23, 2020, Mr. Goens was admitted for long-term epilepsy monitoring to characterize his seizures between epileptic and non-epileptic. (Tr. 507). On admission, he reported taking his antiseizure medications once instead of twice per day as prescribed. (Tr. 675). During his three-day admission, EEGs and EKGs were normal and no epileptiform activity or seizures were recorded. (Tr. 507-08). Mental status examination on discharge was normal, without confusion, hallucination, or delusion; physical examination revealed normal muscle strength without involuntary movements or tremor, intact fine motor control over all extremities, normal gait, and symmetric reflexes. (Tr. 508).

On June 30, 2020, Mr. Goens met with Dr. Khan and denied any recurring seizure-like activity and staring spells since his visit in May 2020. (Tr. 666). He reported being compliant with his medications and denied side effects from Vimpat but thought that Keppra may be affecting his depression and anxiety. (*Id.*). He denied any alcohol use since his last hospital admission. (Tr. 670). Dr. Khan noted it was unclear if Mr. Goens was having epileptic seizures, non-epileptic seizures, or syncopal episodes. (*Id.*). Based on Mr. Goens' reported side effects and past history of schizophrenia and mood disorder, Dr. Khan decided to switch Keppra to Depakote if his ammonia labs and liver function were normal. (*Id.*). She advised Mr. Goens to seek counseling and a psychiatric evaluation and follow seizure precautions. (Tr. 670-71).

At his next telehealth counseling session with Ms. Macek on July 13, 2020, Mr. Goens was dysphoric and anxious; he reported stopping all medication three days ago because he does not like the way it makes him feel. (Tr. 642). On July 20, 2020, Mr. Goens reported still not taking his medication because he does "not feel like himself," and endorsed only "mild seizures" and hallucinations that were not as bad as before. (Tr. 1002).

On December 18, 2020, a vascular lower extremities study performed to investigate calf tenderness revealed a subacute superficial vein thrombosis of the left short saphenous vein. (Tr. 1314). On December 28, 2020, Mr. Goens met with vascular physician Chompunut Asava Aree, M.D., for evaluation of the thrombosis. (Tr. 1368). He reported one seizure last week and admitted to noncompliance with his antiseizure and psychiatric medications for six months because he did not feel they were working. (*Id*.). Mr. Goens had mild left calf tenderness, improved, and hyperpigmentation at the left medial posterior calf. (Tr. 1371). Neurological testing was normal. (Tr. 1371-72). Dr. Aree ordered a repeat venous duplex ultrasound and recommended walking exercise and compression stockings. (Tr. 1375).

On January 5, 2021, Mr. Goens presented at the emergency department after he attempted to donate plasma but was turned away because of an elevated heartrate. (Tr. 1318). Mr. Goens denied fever, chest pain, chills, shortness of breath, abdominal pain, nausea, vomiting, weakness, dizziness, and lightheadedness. (*Id*.). He admitted smoking one pack of cigarettes a week and drinking alcohol, but not every day. (*Id*.). He was discharged after receiving an IV fluid bolus for likely dehydration and underwent testing to rule out a pulmonary embolism. (Tr. 1321, 1324).

On January 6, 2021, Mr. Goens met Dr. Khan and reported running out of seizure medications three to four months before. (Tr. 1345). Mr. Goens endorsed twelve seizures since then and complained of fatigue. (Tr. 1345, 1349). Physical and neurological examinations were normal. (Tr. 1349-50). Dr. Khan restarted prescriptions for Vimpat and Depakote and instructed Mr. Goens to follow up in six weeks. (Tr. 1352).

On January 20, 2021, Mr. Goens returned to Dr. Aree's office and described feeling less tightness and tenderness in his left calf. (Tr. 1377). He also claimed he could not afford

compression socks but requested a prescription for Xarelto because his insurance covers it. (*Id.*).
Physical examination revealed continued hyperpigmentation at the left medial posterior calf. (Tr.
1379). Dr. Aree ordered a CT angiogram and repeat venous duplex ultrasound, prescribed Xarelto,
and gave Mr. Goens a pair of compression socks. (*Id.*).

On February 10, 2021, Mr. Goens went to the emergency department with multiple
complaints, including multiple seizures each week despite current medication compliance. (Tr.
1395). Laboratory testing showed subtherapeutic levels of valproic acid and Vimpat in his system.
(Tr. 1399, 1401). Mr. Goens explained he did not take his evening doses of the antiseizure
medication, only his morning doses, meaning he was only taking one-half of the prescribed dose.
(*Id.*). After receiving his evening dose of Vimpat and valproic acid for seizures and Tylenol for a
headache and backache, he was discharged. (*Id.*).

Mr. Goens returned to Dr. Khan's office on February 17, 2021 and reported one seizure
since his January office visit. (Tr. 1359). He endorsed taking Depakote as prescribed, but not
Vimpat because he was unsure if his insurance company approved it. (*Id.*). Dr. Khan increased
Depakote and ordered Mr. Goens to call the clinic back with information about whether his
insurance would cover Vimpat. (Tr. 1365).

Mr. Goens also met with Dr. Aree on February 17, 2021, where physical and neurological
examinations were normal. (Tr. 1382-84). Dr. Aree reviewed the CT scan showing no pulmonary
embolism and the repeat venous duplex ultrasound showing no significant change to the left
superficial vein thrombosis, discontinued Xarelto, and suggested Mr. Goens follow up in one year.
(Tr. 1384, 1386, 1390).

On February 24, 2021, Mr. Goens told a behavioral health nurse that he stopped taking his medications around May because he "felt like he was outside of his body while on them." (Tr. 1726). He only takes "maybe Depakote" for seizures. (*Id.*). He reported still seeing things that are not there, like "people that are long gone," who talk to him, but do not say anything harmful or dangerous. (*Id.*). He also endorsed constant depression and anxiety. (*Id.*).

III.  MEDICAL OPINIONS

On July 24, 2020, State agency psychological consultant Paul Tangeman, Ph.D., reviewed Mr. Goens' records and determined he was not disabled. (Tr. 67-84). Dr. Tangeman identified severe medically determinable impairments of schizophrenia, alcohol abuse, epilepsy, and depressive/bipolar disorder and concluded Mr. Goens was moderately limited in his abilities to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. (Tr. 69-70). Dr. Tangeman also found Mr. Goens moderately limited in his abilities to understand, remember, or carry out detailed instructions, maintain attention and concentration for extended periods of time, complete a normal workday and work week without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept instructions and respond to criticism from supervisors, and respond appropriately to changes in the work setting. (Tr. 72-73). Given these moderate limitations, Dr. Tangeman concluded Mr. Goens could understand and complete simple tasks, maintain concentration to complete simple tasks, cope with stressors in a routine and predictable work environment, occasionally interact with others, and adapt to routine and predictable changes. (*Id.*).

14

On August 14, 2020, State agency medical consultant Mehr Siddiqui, M.D., also reviewed Mr. Goens' records and determined he was not disabled. (Tr. 67-84). Dr. Siddiqui found no exertional limitations but concluded Mr. Goens could never climb ladders, ropes, or scaffolds and must avoid all exposure to hazards such as dangerous machinery, commercial driving, or unprotected heights due to his history of a seizure disorder. (Tr. 71-72). Dr. Siddiqui explained that Mr. Goens has a seizure disorder but the response to medication is adequate with compliance and no alcohol use, and notes that alcohol is typically noted when Mr. Goens goes to the emergency department for seizure treatment. (Tr. 72).

On September 29, 2020, Dr. Khan completed a form indicating Mr. Goens suffers from dyscognitive seizures occurring at least once every two months for at least three consecutive months despite adherence to prescribed treatment and has marked limitations in understanding, remembering, or applying information and interacting with others. (Tr. 1011). Dr. Khan stated Mr. Goens had three to four seizures a month on average, was compliant with his medication regimen, and will continue to have seizures despite compliance. (Tr. 1012).

In November 2020, State agency psychological consultant Ermias Seleshi, M.D., and State agency medical consultant Maureen Gallagher, D.O., reviewed additional records and concluded the findings at the initial determination were consistent with and supported by the evidence in the file. (Tr. 89-91).

On May 27, 2021, Mr. Goens attended a consultative psychological evaluation with Daniel Watkins, Ph.D. (Tr. 1762-69). There, Mr. Goens claimed he was not able to work due to a seizure disorder and mental health issues, stating he had been fired after having seizures while at work. (Tr. 1763-64). Testing revealed a full-scale IQ of 75, falling in the borderline range, with some

15

strength in perceptual reasoning (nonverbal problem-solving). (Tr. 1766). Based on the interview, psychological testing, and some medical records, Dr. Watkins offered opinions on Mr. Goens' abilities and limitations. In understanding, remember, and carrying out instructions, Dr. Watkins determined Mr. Goens would be expected to have no difficulty with simple, concrete instructions but increased difficulty with complex or abstract instructions, and may require more repetition or explanation of instructions than a typical worker. (Tr. 1767-68). Mr. Goens' ability to sustain attention and concentration was adequate for the purposes of evaluation and appears to be adequate for an ordinary workday if the tasks fall within his intellectual and physical limitation. (Tr. 1768). He has a moderate limitation in responding appropriately to supervision and coworkers in light of his anxiousness being around other people and his preference to work alone. (*Id.*). Finally, Mr. Goens is likely to be limited to a low-pressure work setting. (*Id.*). Dr. Watkins also commented on Mr. Goens' insight and judgment, noting, "Insight is superficial and limited. Reality testing appears to be impaired. Judgment skills appear to be minimally adequate to allow for independent functioning and for participation in treatment. Judgment skills may not be adequate to allow for much work-related decision-making." (Tr. 1766).

## IV.    ADMINISTRATIVE HEARING

At the hearing, Mr. Goens testified he cannot work because he has mood swings, sees things, blurts things out, disassociates, and does not get along with others. (Tr. 50). He can walk about a block and a half and can stand without breaks for about an hour or an hour and a half until his knees start hurting. (Tr. 51). Mr. Goens can bend and squat but these positions cause pain. (*Id.*). He can lift up to 15 pounds and sit for about 25 minutes at a time before lower back pain sets in. (Tr. 52). He can clean, do chores, and handle personal hygiene without help. (Tr. 53).

16

Mr. Goens testified his last alcoholic beverage was three weeks before the hearing. (Tr. 52). He sleeps three to four hours at a time and takes naps most days. (Tr. 53). He used to enjoy making latch hook rugs, exercising, and playing board games and cards. (Tr. 54).

Mr. Goens has a history of seizures and believes he had a seizure the night before the hearing. (Tr. 55) ("I think I passed out and when I came out of it, I was disoriented. And I didn't know where I was."). About half of his seizures are accompanied by disorientation lasting approximately twenty minutes. (*Id.*). He also experiences memory loss after a seizure. (*Id.*). He takes medication for the seizures but finds it not very effective. (Tr. 56).

Mr. Goens also has mental health issues and is in counseling for past abuse and diagnoses of bipolar disorder and schizophrenia. (Tr. 56). He and his therapist work on enhancing his coping mechanisms to help deal with his mood swings. (*Id.*). Mr. Goens described himself as "very antisocial," testified he does not trust others, and endorsed feeling "very nervous" when around strangers or in a crowd. (Tr. 57). He also hears voices and sees things. (*Id.*).

VE Mary Everts identified Mr. Goens' past relevant work as: (1) box maker (DOT 920.587-018; medium as generally performed, light as actually performed; SVP 2) and (2) construction helper (DOT 869.687-026; very heavy as generally performed, light as actually performed; SVP 2). (Tr. 58). The ALJ then asked if a hypothetical individual of Mr. Goens' age, education, and experience could perform his past relevant work if subject to medium exertion work and further limited follows: never climb ladders, ropes, or scaffolds; frequently use the left lower extremity to operate foot controls; avoid all exposure to hazards such as dangerous moving machinery, commercial driving, and unprotected heights; limited to simple, routine, and repetitive tasks in a work environment free from fast-paced production requirements, such as moving assembly line by

a conveyor belt, involving only work-related decisions with few, if any, workplace changes; and occasionally interact with the general public, coworkers, and supervisors. (Tr. 58-59). The VE determined the hypothetical individual could not perform Mr. Goens' past relevant work but identified three other positions, including: (1) laundry worker (DOT 361.685-018; SVP 2; 10,000 jobs nationally); (2) janitor (DOT 381.687-010; SVP 2; 80,000 jobs nationally); and (3) kitchen helper (DOT 318.687-010; SVP 2; 140,000 jobs nationally). (Tr. 59-60).

If subject to the same limitations but restricted to light exertion, the hypothetical individual could perform work as follows: (1) retail marker (DOT 209.587-034; SVP 2; 226,000 jobs nationally); (2) cleaner (DOT 232.687-014; SVP 2; 220,000 jobs nationally); and (3) shipping and receiving weigher (DOT 222.387-074; SVP 2; 8,000 jobs nationally). If the hypothetical individual needed to alternate positions at his workstation for one to two minutes every thirty minutes, the individual could perform work as follows: (1) assembler (DOT 706.684-022; SVP 2; 60,000 jobs nationally); (2) general office helper (DOT 239.567-010; SVP 2; 13,000 jobs nationally); and (3) shipping and receiving weigher, but reduced to 4,000 jobs nationally. (Tr. 60-61).

If a hypothetical individual was restricted to sedentary work and subject to all limitations previously identified, including the need for a sit/stand option, the individual could perform work as (1) document preparer (DOT 249.587-018; SVP 2; 18,000 jobs nationally); (2) inspector (DOT 669.687-014; SVP 2; 5,000 jobs nationally); (3) surveillance system monitor (DOT 379.367-010; SVP 2; 3,000 jobs nationally); and (4) sorter (DOT 521.687-086; SVP 2; 2,000 jobs nationally). (Tr. 61-62).

The VE also testified that employers tolerate employees being off task no more than 15%
of the workday and being absent, coming in late, or leaving early no more than once a month. (Tr.
62). More off-task behavior and additional absences on a consistent and unscheduled basis are
work preclusive. (*Id.*).

## THE ALJ'S DECISION

The ALJ's decision included the following findings of fact and conclusions of law:

1.     The claimant meets the insured status requirements of the Social Security
   Act through March 31, 2022.

2.     The claimant engaged in substantial gainful activity from August 23, 2018
   through October 23, 2019 (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

   The claimant worked from August 2018 through November 2019.
   Specifically, he earned $15,173 during the last two quarters of 2018, above
   the SGA threshold of $14,160 in 2018. He earned $23,540 in 2019, when
   the SGA threshold was $14,640. Consequently, the claimant engaged in
   substantial gainful activity from August 2019 through November 2019.
   Despite the fact that the claimant clearly demonstrates the ability to
   perform substantial gainful activity after his alleged onset date of disability,
   the undersigned alternatively elects to continue the sequential evaluation
   process deciding this claim at a later step

3.     The claimant has the following severe impairments: seizures/pseudo
   seizures, substance dependence (alcohol), posttraumatic stress disorder
   (PTSD), schizoaffective disorder, recurrent major depression with psychotic
   features/bipolar (20 CFR 404.1520(c) and 416.920(c)).

4.     The claimant does not have an impairment or combination of impairments
   that meets or medically equals the severity of one of the listed impairments
   in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d),
   404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

5.     After careful consideration of the entire record, the undersigned finds that
   the claimant has the residual functional capacity to perform medium work
   as defined in 20 CFR 404.1567(c) and 416.967(c) except he cannot climb
   ladders, ropes, or scaffolds. He can frequently operate foot controls with the
   left lower extremity. He must avoid all exposure to hazards such as
   dangerous moving machinery, commercial driving, and unprotected

heights. He can perform simple, routine, and repetitive tasks in a work environment free from fast-paced production requirements such as moving assembly lines and conveyor belts, involving only work-related decisions and few if any workplace changes. He can occasionally interact with the general public, coworkers, and supervisors.

6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.   The claimant was born on October 13, 1972, and was 0 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.   The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9.   Transferability of job skills is not an issue in this case because the claimant's last relevant work is unskilled (20 CFR 404.1568 and 416.968)

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from October 13, 1972, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 27-35).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision is supported by substantial evidence, the Court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004).

21

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11 13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *Hook v. Astrue,* No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) and 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) and 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Mr. Goens asserts two arguments related to the ALJ's assessment of his treatment non-compliance. First, at Step Three, he claims the ALJ should have considered whether his seizure disorder meets Listing 11.02(A) or (B) for epilepsy. (Pl.'s Br., ECF #9, PageID 1813). Mr. Goens acknowledges his "questionable" treatment compliance but argues he had good reasons for not regularly taking his medication and the ALJ erred by failing to consider them as required in the Listing of Impairments 11.00(H)(4)(d). (*Id.* at PageID 815). Similarly, Mr. Goens asserts the RFC does not adequately account for his seizure disorder because the ALJ concluded his seizures were "largely the product of non-compliance without considering possible reasons for his non-compliance," as required by Social Security Ruling (SSR) 16-3p. (*Id.* at PageID 1816).

The Commissioner responds the ALJ was not obligated to discuss Listing 11.02 because Mr. Goens did not mention the Listing at the administrative hearing and, in any event, remand is not required because Mr. Goens has not raised a substantial question that his seizure disorder satisfied a Listing. (Comm'r's Br., ECF #12, PageID 1835-36). The Commissioner also claims the

ALJ properly considered Mr. Goens' non-compliance with treatment, including taking antiseizure medications as prescribed and avoiding alcohol consumption, and discussed it at length in his decision. (*Id.* at PageID 1846-48).

**A.     The ALJ's error in not evaluating whether Mr. Goens meets Listing 11.02 is harmless.**

At Step Three, a claimant will be found disabled if his impairment meets or equals one of the listed impairments. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 491 (6th Cir. 2010). The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Commissioner considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§ 404.1525(a), 416.925(a). As such, a claimant who meets the requirements of a listed impairment will be deemed conclusively disabled and entitled to benefits. *Id.* It is the claimant's burden to establish that claimed impairments meet or are medically equivalent to a listed impairment. *See, e.g., Lett v. Colvin*, No. 1:13 CV 2517, 2015 WL 853425, at *15 (N.D. Ohio Feb. 26, 2015).

The Sixth Circuit does not require an ALJ to address every listing or discuss listings the claimant clearly does not meet, *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 Fed. App'x 426, 432 (6th Cir. 2014), but the ALJ should analyze a relevant listing where the record "raise[s] a substantial question as to whether [the claimant] could qualify as disabled." *Abbott v. Sullivan*, 905 F.2d 918, 925 (6th Cir. 1990). Reversal is not warranted when the ALJ's Step Three conclusion is sufficiently supported by factual findings elsewhere in the decision. *Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014). Where the ALJ's decision does not discuss a listing subsequently raised in objection, the court "must determine whether the record evidence raises a substantial question

24

as to [the claimant's] ability to satisfy each requirement of the listing." *Smith-Johnson*, 579 Fed.

App'x at 433. To raise a "substantial question," the claimant "must point to specific evidence that

demonstrates [he] reasonably could meet every requirement of the listing.... Absent such evidence,

the ALJ does not commit reversible error by failing to evaluate a listing at Step Three." *Id.* at 432-

33.

Epilepsy is a pattern of recurrent and unprovoked seizures that are manifestations of

abnormal electrical activity in the brain. 20 C.F.R. Pt. 404, Subpt. P, App. 1, 11.00(H)(1).

Psychogenic nonepileptic seizures and pseudo seizures are not epileptic seizures for the purpose of

Listing 11.02, and are instead evaluated under the mental disorders body system, Listing 12.07

(somatic symptom and related disorders). *Id.* at 12.00(B)(6). To meet Listing 11.02(A), the claimant

must show "generalized tonic-clonic seizures, occurring at least once a month for at least 3

consecutive months despite adherence to prescribed treatment." *Id.* at 11.02(A). Such seizures are

characterized by loss of consciousness accompanied by a tonic phase (sudden muscle tensing

causing the person to lose postural control) followed by a clonic phase (convulsions). *Id.* at

11.00(H)(1)(a). To meet Listing 11.02(B), the claimant must show "dyscognitive seizures, occurring

at least once a week for at least 3 consecutive months despite adherence to prescribed treatment."

*Id.* at 11.02(B). Dyscognitive seizures are characterized by alteration of consciousness without

convulsions or loss of muscle control and blank staring may occur. *Id.* at 11.00(H)(1)(b). According

to the Listings, "despite adherence to prescribed treatment" means the claimant has taken

medication or followed other treatment procedures for the disorder as prescribed by a physician

for three consecutive months but the impairment continues to meet the other listing requirements

despite this treatment. *Id.* at 11.00(C). Seizures that occur during a period when the claimant is

not adherent to prescribed treatment are not counted unless the claimant had good reason for non-compliance. *Id.* at 11.00(H)(4)(d). When determining if the claimant has an acceptable reason for non-compliance, the ALJ will consider the claimant's physical, mental, education, and linguistic limitations. 20 C.F.R. §§ 404.1530(c), 416.930(c). Failure to follow prescribed treatment without good reason results in a finding of not disabled. *Id.* at §§ 404.1530(b), 416.930(b).

Here, at Step Two, the ALJ identified "seizures/pseudo seizures," not epilepsy, as a severe medically determinable impairment. (Tr. 27). Mr. Goens' medical records do not indicate he was ever diagnosed with epilepsy, treating providers never identified epileptiform activity on short- or long-term EEGs, doctors and nurses described the episodes as pseudo-seizures and staring spells from which Mr. Goens emerged alert, and there are treatment recommendations for psychiatric evaluations in the context of his seizures; however, treating providers never exactly diagnosed pseudo seizures either. But the impairment the ALJ deemed severe, "seizures/pseudo seizures," is ambiguous because it suggests both an epileptic based impairment (seizure) and a non-epileptic based impairment (pseudo seizure). The impairments are evaluated under different listings, neither of which the ALJ explicitly analyzed at Step Three. The ALJ's discussion of the medical evidence, copied below, strongly suggests he found pseudo seizures the more likely culprit, but it is neither explicit nor so apparent as to permit the reviewing Court to resolve the ALJ-created ambiguity. This is error.

Greater exactitude from the ALJ on the nature of the severe impairment, neurological or mental disorder, certainly would have permitted less strenuous judicial review, but the remainder of the disability determination contains enough factual findings to constitute substantial evidence for finding Mr. Goens not disabled at Step Three. Elsewhere in the decision, the ALJ stated:

The claimant went to the emergency room in March 2019 after falling during a seizure, striking his left ribs on the floor. X-rays showed no acute findings and the claimant reported not taking his anti-seizure medication because 'it does not work.' In November 2019 he went to the emergency room for chest pain. He admitted to drinking that day and to not taking his anti-seizure medication. He had what appeared to be a pseudo seizure at the emergency room from which he immediately came out. Ethanol level was at .09 g/dl. The claimant remained at the emergency room for 5 hours until no longer intoxicated. The claimant was having recurring spells in April 2020, suggestive of complex partial seizures versus non-epileptic spells. At the emergency room, he received intravenous Keppra and Vimpat until attaining therapeutic levels and continued on Keppra and Vimpat twice daily, deriving significant improvement in seizure frequency. An MRI of the brain showed no acute intracranial abnormality. An EEG performed during wakefulness and sleep did not demonstrate evidence of ongoing electrographic seizure activity and no epileptiform discharge. UDS was negative and blood alcohol level was 197. Upon remaining seizure free on Keppra and Vimpat and tolerating them well, he was discharged with instructions to follow with neurology clinic in four to six weeks. Two days later, he was admitted for management of seizures after presenting to the emergency room reporting five seizures. He had not filled his prescription for Vimpat. A neurologist diagnosed non-convulsive complex partial seizure. Symptoms improved with Keppra and Vimpat. A CT of the head did not show[sic] and a brain MRI was unremarkable. An EEG did not demonstrate any ongoing seizure activity or epileptiform discharge. He was evaluated by neurology and was diagnosed with breakthrough seizures secondary to alcohol intoxication and medication noncompliance. On discharge, the claimant followed with his primary care providers. He presented alert and oriented with no impairment of recent or remote memory, normal attention span and ability to concentrate, name objects and repeat phrases. He was to take medications as prescribed at the hospital and follow with neurology. Less than a week later, he was back in the emergency room with a possible witnessed seizure. A CT of the head showed no acute findings. He was loaded with Keppra and stabilized before discharge.

Neurologist Shireen Khan, M.D., saw the claimant on May 11, 2020. The claimant reported medications were not helping him much with the seizures as he still had almost daily seizure episodes, staring spells and some major passing out episodes once per month despite medication compliance. In light of unremarkable testing results during hospitalization and reported compliance with medication, Dr. Khan ordered further testing. A long-term (3 days) video EEG monitoring did not record any events. Interictal EEG was normal. 2D echo showed EF of more than 55%, otherwise unremarkable and tilt table test was negative. Claimant reports compliance with medications (Keppra and Vimpat) with no side effects. Dr. Khan recommended seizure/spell precautions, maintain seizure diary, recommended behavioral health care and to follow with clinic in two to three months. Most recently, in February 2021, the claimant went to the emergency room as he was

having seizures a couple times per week and an allover headache. He reported being out of his anti-seizure medications for the past few months. The complaints appeared chronic in nature and seizing three times per week appeared due to chronic noncompliance. His valproic acid level was subtherapeutic at 39.

(Tr. 31-32) (cleaned up). Later, when addressing the medical opinions, the ALJ stated:

Neurologist Shireen Khan, M.D., checked off responses to a questionnaire regarding the claimant's seizure activity indicating marked limitation in understanding, remembering or applying information and interacting with others, occurring three to four times per month. Further, Dr. Khan indicated the claimant is compliant with medication regimen and would continue to have seizures even if he takes all medication as prescribed. The responses are conclusive, lacking an explanation or rationale. The record documents the claimant does not like to take medications and often stops taking them. Additionally, the opinion is not consistent with neurological evaluations including Dr. Khan's own treatment notes, and objective medical evidence of breakthrough seizures secondary to alcohol intoxication and medication noncompliance. Furthermore, frequency of seizures diminishes with medication, and the condition becomes stable with therapeutic levels of anti-seizure medications.

(Tr. 34).

Mr. Goens believes the ALJ should have analyzed his severe impairment under Listing 11.02 for epilepsy and claims the record supports a finding that his seizure disorder met Listing 11.02(B), requiring dyscognitive seizures once a week for three months despite adherence to treatment. (ECF #9 at PageID 1817). In support, he points to witnessed seizures in March 2020, described as recurrent spells of unresponsiveness, his diagnosis of complex partial seizures in April 2020, Dr. Khan's statement in September 2020 that he has three to four seizures a month, and his report of more frequent seizures ("a couple times a week") in February 2021. (*Id.* at PageID 1818). Mr. Goens has not met his burden to point to specific evidence demonstrating he could reasonably meet every requirement of the listing. *Smith-Johnson,* 579 Fed. App'x at 432-33. The evidence to which he points in March and April 2020 does not establish dyscognitive seizure frequency of once a week for three consecutive months, nor does self-reported seizures "a couple

28

times a week" in February 2021. Moreover, Mr. Goens' hospital records from March and April of 2020 contain diagnostic impressions suggesting pseudo seizures, not dyscognitive seizures. The ALJ's conclusion that Dr. Khan's statements were not supported by any explanation or rationale and inconsistent with his own treatment notes and other medical records is reasonable and supported by substantial evidence.

Mr. Goens does not argue that the ALJ's evaluation of Dr. Khan's opinion was in error, but that the ALJ did not rely on any specific medical opinion regarding the severity or impact of his seizures when assessing the RFC. He does not cite case law in support of this argument. The responsibility for determining a claimant's RFC rests with the ALJ, not a physician. *See* 20 C.F.R. §§ 404.1546(c), 416.946(c). Although the ALJ may not substitute his opinion for that of a physician, he is not required to recite the medical opinion of a physician verbatim in his RFC finding. *See* 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). An ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual function capacity finding. *See Ford v. Comm'r of Soc. Sec.*, 114 Fed. App'x 194, 197 (6th Cir. 2004). As discussed in more detail below, the ALJ properly considered Mr. Goens' noncompliance with medication and recommended avoidance of alcohol. Mr. Goens has not met his burden to show that he meets the required criteria and therefore, the fact the ALJ did not analyze Listing 11.02 is harmless error.

To the extent the ALJ's finding of severe "seizures/pseudo seizures" directs an analysis under Listing 12.07, the ALJ's Step Three analysis is sufficient to conclude Mr. Goens does not meet it. To meet Listing 12.07, a claimant must show documentation of certain symptoms and an extreme limitation of one, or marked limitation of two, of the four areas of mental functioning;

29

that is, the abilities to: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself. 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.06.

Here, the ALJ determined Mr. Goens has only moderate limitations in all four areas of mental functioning and Mr. Goens has not argued otherwise or that the ALJ's evaluation of the areas of mental functioning was not proper. Therefore, Mr. Goens cannot show he meets the criteria for Listing 12.06 and the ALJ's failure to explicitly analyze the Listing at Step Three is harmless.

Accordingly, I decline to recommend remand based on Mr. Goens' first argument.

**B.      The ALJ's evaluation under SSR 16-3p was proper.**

Mr. Goens next argues the ALJ improperly discredited the severity of his epilepsy based on non-compliance without considering whether his mental health issues established a good reason for non-compliance with anti-seizure medications as required SSR 16-3p. (ECF #9 at PageID 1815-16, 1820).

An ALJ follows a two-step process for evaluating an individual's symptoms. First, the ALJ determines whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p, 2017 WL 5180304. Second, the ALJ evaluates the intensity and persistence of the individual's symptoms and determines the extent to which they limit the individual's ability to perform work-related activities. *Id.*

At the second stage, the ALJ considers the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons;

and any other relevant evidence in the individual's case. *Id*. In addition, the ALJ uses the factors

set forth in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) to evaluate the individual's statements,

including: (1) a claimant's daily activities; (2) the location, duration, frequency, and intensity of

pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type,

dosage, effectiveness, and side effects of any medication an individual takes or has taken to

alleviate pain or other symptoms; (5) treatment, other than medication, an individual receives or

has received for relief from pain or other symptoms; (6) any measures other than treatment an

individual uses or used to relieve pain or other symptoms; and (7) any other factor concerning an

individual's functional limitations and restrictions due to pain and other symptoms. The ALJ is

not required to analyze all seven factors, only those germane to the alleged symptoms. *See, e.g.*,

*Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005) ("The ALJ need not

analyze all seven factors identified in the regulation but should provide enough assessment to

assure a reviewing court that he or she considered all relevant evidence.").

The ALJ is not required to accept the claimant's subjective complaints and may discount

subjective testimony when the ALJ finds those complaints to be inconsistent with objective

medical and other evidence. *Jones*, 336 F.3d at 475-76. The ALJ's decision must include "specific

reasons for the weight given to the individual's symptoms" in a "consistent" and "clearly

articulated" way, so "any subsequent reviewer can assess how the adjudicator evaluated the

individual's symptoms." *Id*. at *10. The ALJ need not use any "magic words," so long as it is clear

from the decision as a whole why the ALJ reached a specific conclusion. *See Christian v. Comm'r of*

*Soc. Sec.*, No. 3:20-CV-01617, 2021 WL 3410430, at *17 (N.D. Ohio Aug. 4, 2021).

An ALJ's determination of subjective evidence receives great deference on review. *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012). Absent compelling reason, this Court may not disturb the ALJ's analysis of the claimant's subjective complaints, or the conclusions drawn from it. *Baumhower v. Comm'r of Soc. Sec.*, No. 3:18-CV-0098, 2019 WL 1282105, at *2 (N.D. Ohio Mar. 20, 2019). "As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, we are not to second-guess[.]" *Ulman*, 693 F.3d at 713-14.

Contrary to Mr. Goens' assertion, the ALJ acknowledged the reasons Mr. Goens gave for not taking his anti-seizure medications, including that they did not work, he forgot what he was supposed to take, and he does not like to take them. (Tr. 31, 32, 34). In so considering, the ALJ found "[t]he record reflects chronic non-compliance with anti-seizure medication and stabilization of the condition when he takes them or intravenously receives them in hospital/emergency room settings." (Tr. 31). Plainly, the ALJ considered Mr. Goens' reasons but determined they were not sufficient to justify his non-compliance.

Courts in the Sixth Circuit recognize that mental health conditions may provide good reason to excuse noncompliance with prescribed treatment. *Burge v. Comm'r of Soc. Sec.*, No 1:13 CV 87, 2013 WL 6837192, at *3 (N.D. Ohio Dec. 26, 2013). But that does not establish a per se rule that the existence of a mental impairment constitutes an acceptable reason for failure to follow prescribed treatment. *Smith v. Astrue*, 1:12-CV-00831, 2012 WL 6607007, at *5 (N.D Ohio Dec. 18, 2012). Instead, the record must contain evidence expressly linking the noncompliance with the severe mental impairment. *Black v. Comm'r of Soc Sec.*, 1:13 CV 229, 2013 WL 6837193, at *4 (N.D. Ohio Dec. 26, 2013); *Ross v. Comm'r of Soc. Sec.*, 1:12 CV 543, 2013 WL 1284031, at *13 (N.D. Ohio May 26, 2013).

Mr. Goens points to certain findings he believes would "reasonably constitute mental barriers of compliance," including "generalized confusion, confusion regarding which medications he was required to take, how often he was required to take his medications, poor memory, a history of learning disabilities with borderline intellectual functioning (with a full-scale IQ of 75), limited insight, [and] impaired reality testing," and claims those are good reasons to excuse his noncompliance with treatment. (ECF #9 at PageID 1815). But he fails to cite any record evidence expressly linking his noncompliance with anti-seizure medication to any severe mental impairment and a review of the record reveals none.

Mr. Goens claims his case is like *Rex v. Kijakazi*, No. 3:20-CV-1663, 2021 WL 4393104, at *15 (N.D. Ohio Aug. 25, 2021), *report and recommendation adopted*, 2021 WL 4391218 (N.D. Ohio Sept. 24, 2021), where the district court remanded the matter when the ALJ did not address the relationship between the severe impairments of bipolar and epilepsy. More accurately, that court remanded the matter because the "ALJ d[id] not address the relationship between bipolar disorder and epilepsy, even though she explicitly stated that Rex's non-compliance with treatment was at least partially a result of his bipolar disorder." *Id.* That is distinguishable from the ALJ's decision here, which contains no such acknowledgement. Indeed, neither do the medical records expressly link Mr. Goens' noncompliance with medication to his mental impairments.

Finally, Mr. Goens claims "the ALJ suggested that Goens' frequent seizures were the result of either non-compliance or alcohol use but failed to follow the five-step evaluation process before determining the materiality of alcohol use." (ECF #9 at PageID 1817). Not quite. The ALJ explicitly stated: "The record reflects chronic non-compliance with anti-seizure medication and

stabilization of the condition when he takes them or intravenously receives them in hospital or emergency room settings." (Tr. 31).

Under 42 U.S.C. § 423(d)(2)(C), a claimant cannot receive disability benefits "if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled." But that determination is reserved only for instances where a claimant is first found disabled. 20 C.F.R. §§ 404.1535(a), 416.935(a). The ALJ determined Mr. Goens not disabled despite the presence of alcohol use disorder and the written decision demonstrates the ALJ relied on Mr. Goens' chronic non-compliance with medication to discount his credibility, not alcohol use.

## Conclusion and Recommendation

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **AFFIRM** the Commissioner's decision denying disability insurance benefits and supplemental security income.

Dated: October 11, 2023

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

## Objections, Review, and Appeal

**Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge.** _See_ **Fed. R. Civ. P. 72(b)(2);** _see also_ **28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.**

**Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or**

whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).